E-FILED
Wednesday, 28 September, 2022  12:44:38 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

MELANIE LEMKE, individually and on
behalf of all others similarly situated,

Plaintiff,

v.

GARRISON PROPERTY AND CASUALTY
INSURANCE COMPANY,

Defendant.

Case No. _____

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Melanie Lemke ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against Garrison Property and Casualty Insurance Company ("Garrison") and in support thereof states the following:

## NATURE OF THE ACTION

1.      When Plaintiff Lemke suffered a total loss of her vehicle, Garrison failed to pay her the full amount to which she was entitled under her automobile policy. This was not an isolated incident. To the contrary, it is a fundamental component of Garrison's business practices.

2.      Plaintiff Lemke was the named insured under a Garrison automobile policy (the "Garrison Policy" or the "Policy"), which included Comprehensive and Collision coverage for automobile damage. Garrison's Comprehensive and Collision coverages allow for Garrison to limit its liability to an insured vehicle's actual cash value ("ACV") in the event of total loss.

3.      Garrison also defines ACV as the cost to buy a comparable replacement vehicle.

4.      Under Illinois law and its policy, Garrison is obligated to base any total loss cash settlement, including an ACV cash settlement, on the retail value of comparable vehicles.

5.    Garrison, through its vendor, calculates the retail value of comparable vehicles when determining the ACV of an insured vehicle. Rather than paying retail value, however, Garrison applies an improper "condition adjustment" deduction to the retail cost of these comparable vehicles to reduce from retail value to private party value, which violates Illinois law and the insurance Policy, necessarily resulting in an underpayment when it pays total-loss cash settlements.

6.    By applying this "condition adjustment," Garrison has breached its promise to pay for loss under its policy, damaging Plaintiff and the other Class members.

## JURISDICTION AND VENUE

7.    This Court has personal jurisdiction over Defendant because Defendant directs, markets, and provides its business activities throughout the State of Illinois and makes its insurance services available to residents of Illinois. Further, this Court has personal jurisdiction over Defendant because Defendant's conduct against Plaintiff occurred in substantial part within this District and because Defendant committed the same wrongful acts to other individuals within this judicial District, such that some of Defendant's acts have occurred within this District, subjecting Defendant to jurisdiction here.

8.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because at least one member of the putative classes, including certain Plaintiff, are citizen of states outside Illinois, and Defendant is a citizen of Texas, meaning that CAFA's minimal diversity requirement is met. Additionally, Plaintiff seeks an award of damages to Plaintiff and the Classes in an amount to be determined at trial, which, when aggregated among a proposed class of potential thousands, exclusive of interest and costs, exceeds the $5,000,000.00 threshold for federal jurisdiction under the Class Action Fairness Act ("CAFA").

9.      Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and (c) because Defendant is deemed to reside in any judicial district in which it is subject to personal jurisdiction, and because a substantial part of the events giving rise to the claim occurred in this District, and because certain Plaintiff was injured in this District.

## THE PARTIES

10.      At all times relevant to this action, Plaintiff Lemke is and was a citizen of the State of Illinois, domiciled in Peoria County. At all relevant times, Plaintiff Lemke was contracted with Garrison for automobile insurance. On or about November 2, 2015, Plaintiff Lemke was in a car wreck and Defendant deemed her vehicle to be a total loss.

11.      At all times material hereto, Defendant Garrison is and was a Texas corporation, headquartered at 9900 Fredericksburg Road, San Antonio Texas, 78288, and authorized to provide insurance in the State of Illinois.

## FACTUAL BACKGROUND

A.    *Overview of Retail Value and Private Seller Value*

12.      Throughout the country, and by leading vehicle valuation companies, vehicles are assigned multiple valuations, each of which is tied to a different category of transaction.  In this case, the most important of these transaction categories are "retail cost" (or retail value) and "private seller cost" (or private seller value).  Other categories, less relevant here, include trade-in value and wholesale value.

13.      These transaction categories are not tied to the actual condition of the vehicle.  For instance, the exact same vehicle will have a different (lower) assigned value for trade-in than for wholesale, a different (lower) assigned value for wholesale than for private seller, and a different (lower) assigned value for private seller than for retail.

14.    The differences in assigned value between the categories is based to a large degree on consumer choice and market realities independent of actual condition. Consumers are willing to pay a car dealership more money than they are willing to pay a private seller for the exact same vehicle in the exact same condition because, amongst other reasons, they have a greater likelihood of effective recourse against a car dealership than a private individual.  Similarly, wholesale value and trade-in value are lower than retail value because car dealerships must necessarily sell a vehicle for more than they pay for it to make a profit.

15.    Leading vehicle valuation companies (NADA and Kelley Blue Book, for instance) provide the aforementioned values – wholesale, trade-in, private seller, and retail – without any evaluation of the actual condition of the vehicle. Indeed, Defendant calculated the retail value without any knowledge or evaluation of the comparable vehicles' condition.

16.    It is based on a reasonable assumption, however, that car dealerships, after purchasing a vehicle (whether at auction or as trade-in), often spend $500.00-$1,000.00 reconditioning or preparing the vehicle for re-sale. Understandably, then, there is a general assumption that, in many cases, the average car for sale from a car dealership will be in a better condition than the average car for sale from a private seller.

**B.    *Overview of Valuing Total-Loss Vehicles***

17.    Generally, auto policies are policies of indemnification – insureds pay money in the form of premiums in exchange for the promise by an insurer that should certain events occur, the insurer will put the insured back into the same position they were in prior to the event insured against.

18.    In this circumstance, "loss" is the word to describe the monetary injury caused by the event insured against, or the monetary amount necessary for the insured to get back to the same

position the insured was in prior to a given event. If, as a result of an accident, the door of an insured vehicle is physically damaged, the amount it would cost for the vehicle to no longer have a damaged door – i.e., the position prior to the insured event – is the "loss" suffered by the insured. This amount necessarily includes purchasing any parts necessary along with the costs in labor to fix the damage or replace the parts. Under the theory of indemnification, of course, such amount would also be the amount owed the person indemnified.

19.    Where the loss reaches a certain threshold, however, it is in the interests of many insurers not to pay the loss, but instead to declare the vehicle to be a "total loss" and to pay the ACV of the vehicle rather than the cost to repair or replace the damage to the vehicle (i.e., to restore the vehicle itself). For instance, suppose a vehicle with an ACV of $10,000.00 is severely damaged, such that the overall amount to buy the parts and perform the labor necessary to put the vehicle back into its pre-loss condition is $15,000.00. In such instance, insurers are not obligated to pay the full amount of loss, i.e. $15,000. Instead, their liability is limited to the vehicle's pre-loss value, i.e., $10,000.00. Generally, this is done by limiting the insurer's liability for loss ($15,000.00) to the lesser of the vehicle's pre-loss ACV ($10,000.00) and the cost to repair and replace the damaged parts or vehicle ($15,000). In this hypothetical, because the loss exceeds the ACV, the insurer would be liable only for the ACV.

20.    Of course, actual insurance policies vary on certain items. The parties might agree that, in the event the insured vehicle becomes a total loss, the insurer will find and purchase the exact same vehicle make and model with the exact same color and features and the exact same mileage, and provide said vehicle to the insured. Or the parties might agree that, if the insured vehicle is a total loss, the insurer will pay the insured $1,000.00 irrespective of the value of the vehicle.

21.    Most insurers, however, do not want to be obligated to find precisely the same exact vehicle with precisely the same exact mileage as the insured vehicle in the event of a total loss. Conversely, most insureds do not want a random dollar amount which may or may not approximate the insured vehicle value. Thus, the industry standard has become that insurers do not literally go and purchase the exact same vehicle with the exact same mileage for insureds – instead, insurers promise to pay insureds in money the amount it *would* cost to go out and purchase the same vehicle and leave it to the insureds whether they want to do so, or whether they want to purchase a more expensive or less expensive vehicle, or whether they want to bury the money under a tree.

22.    There are also general industry standards on various categories that might be deducted from the amount owed to insureds. For instance, parties might or might not contract to allow for a deduction of depreciation. Depreciation is a decrease in value of property over time, given age, use and obsolescence. A 2016 model of any given vehicle is of less value than a 2017 model of the exact same vehicle, all else being equal. A 2016 vehicle with 30,000 miles is worth less than a 2016 vehicle with 20,000 miles, all else being equal.

23.    Parties also might or might not contract to allow for a deduction for dealer preparation or reconditioning charges. Deductions of this type generally represent (at least in part) the difference between retail value and non-retail value. Parties also may or may not contract for an automatic and general deductible and the amount of such deductible.

24.    All the aforementioned factors and issues that may or may not be addressed in a given policy are also impacted by various state laws. Many states, recognizing the disparity in bargaining position and the potential ability of insurers to force insureds (many of whom are desperate to quickly procure a vehicle to replace the total-loss vehicle) into accepting an

undervalue of the insured vehicle, have implemented certain restrictions and/or requirements on determining the value of a vehicle.

25.    Some states, for instance, require that the cost be determined by a recognized industry source such as NADA or Kelley Blue Book, or that an insurer offer to actually replace the vehicle, rather than simply paying an amount in money in lieu of replacement, or that the relevant cost to replace is the retail value of a vehicle rather than the private party value.

**C.    *The Garrison Insurance Policy***

26.    Plaintiff Lemke had automobile insurance through Garrison. Plaintiff Lemke's Garrison Policy (a copy of which is attached as Exhibit A hereto) provides that Garrison will pay for loss caused by damage to the vehicle through Collision and Comprehensive coverage, which cover physical damage caused by motor vehicle accidents.  (Ex. A at 18.)

27.    The Garrison Policy's Collision and Comprehensive coverages promise to pay for sudden and accidental direct physical loss.  (*Id.* at 17-18.)  The Policy promises to pay for such loss in money, or to repair or replace the damaged or stolen property.  (*Id.* at 19.)

28.    The Garrison Policy represents that the limit of Garrison's liability for loss, with respect to "Collision" and "Comprehensive" coverage, is, inter alia, the ACV of the vehicle. (*Id.* at 19.)

29.    In determining a vehicle to be a total loss, Garrison is also necessarily determining that the ACV is the basis of the amount owed to insureds, because in the insurance industry, a "total loss" is the term used to describe a situation where the cost to restore the vehicle to its pre-loss position by repairing or replacing the damage is higher than the pre-loss ACV of the vehicle. In other words, whether by restoring the damaged vehicle or paying the cost to purchase precisely the same vehicle, the end result for the insured is the same – an undamaged vehicle. If putting the

insured in that position through payment of ACV and then recovering the salvage value through sale at a salvage auction will cost the insurer less than repairing the vehicle, the loss is called a "total loss."

30.    Said another way, a vehicle is a "total loss" precisely because the insurer has invoked the ACV limit on liability rather than paying to restore the vehicle to its previous condition.

31.    ACV is defined in the Policy as the "amount it would cost, at the time of the accident, to buy a comparable vehicle." (*Id.* at 17.) Similarly, under Illinois law, ACV means cost of replacement minus depreciation. *See, e.g., Carey v. American Family Brokerage, Inc.*, 909 N.E.2d 255, 263 (Ill. App. Ct. 2009) ("The proper calculation of actual cash value under both Illinois law and the policy in the case at bar is replacement cost less depreciation.").

32.    The Policy also contains a Conformity to Law provision stating that if any of the terms of the policy conflict with state or local law, state or local law will apply. (Ex. A at 23.) And Illinois law is clear that relevant statutes and regulations are incorporated into insurance policies in Illinois and inform or govern the relevant rights and obligations under insurance policies.

33.    With respect to the determination of ACV, the Policy does not state the method by which the vehicle's ACV will be determined. For example, the Policy does not state whether the ACV will be calculated based on NADA or Kelley Blue Book value, by some other third party, by an average of public prices by car dealerships in the area, or any other method. Instead, the Policy is silent on this issue, except that it contains the aforementioned Conformity to Law provision—and Illinois law imposes requirements on permissible methods for determining a vehicle's ACV.

34.     When paying cash settlements on total loss claims on the basis of ACV or replacement, Illinois requires insurers to base its payment on the "retail value" of a vehicle, not private party value, and provides four different methods by which the retail value may be determined.  Ill. Admin. Code tit. 50, § 919.80(c)(2).[1]

35.     The Policy, therefore, obligates Garrison to base an ACV cash settlement on the retail value of the vehicle.

36.     Further, when a vehicle is sold by a dealership at retail, the cost to purchase that vehicle includes hundreds of dollars in dealer fees or dealer preparation fees. The retail value, then, is the basis of calculating ACV, but to pay the actual cost to purchase a comparable vehicle, Defendant is required to include these dealer fees. And Illinois law specifically forecloses eliminating dealer fees or dealer prep fees from the ACV payment amount: "Deductions of the kind commonly referred to as "get ready to go" and "dealer prep", or dealer preparation, charges are prohibited." Ill. Admin. Code tit. 50, § 919.80(c)(3)(B).

37.     Notably, Illinois permits insurers to condition payment of sales tax and title fees on the insured submitting proof of replacement and of the amount incurred in such taxes and fees. However, it does not permit insurers to condition payment of dealer preparation fees on proof of

---

[1] States generally fall into two camps. First, there are states that, like Illinois, require payment of retail value (sometimes absent certain rare exceptions). *See, e.g.*, 10 C.C.R. § 2695.8(b)(2) (case settlements must be based on comparable vehicles "available for retail purchase" and cannot include any deductions "for the condition of a loss vehicle" unless it is in below average condition); Va. Admin. Code § 46.2-1600 (defining actual cash value to mean "retail cash value"). Other states do not require calculations based on retail value, thus allowing, if permitted by the insurance policy, for calculations based on private party value. There is merit to both positions. On one hand, most insureds do not maintain their vehicles in retail condition, and thus indemnifying insureds ***in theory*** would be the amount to purchase a comparable vehicle in private party condition. On the other hand, most insureds will be purchasing a replacement vehicle from a dealer, and thus indemnifying insureds ***in reality*** would be the amount to purchase a comparable vehicle in retail condition. Irrespective of which is the better perspective, however, Illinois has chosen to require payment of retail value.

replacement. Instead, it outright forecloses insurance companies from deducting such fees from the obligated actual purchase cost amount.

38.    Taken as a whole, the Policy, conformed as necessary to Illinois law, expresses the intent to pay, in the event of a total loss, the retail value of the total loss vehicle, not private party value, and to include dealer preparation fees in that amount.

39.    Because the Policy promises to conform to applicable state law, the payment of ACV, as promised by the Policy, must be based on retail value, as opposed to private party value.

40.    Further, consistent with Illinois law, Defendant is obligated to pay the "actual cost to buy" a comparable vehicle. This actual cost includes dealer preparation fees, which are imposed on vehicle transactions by car dealerships. Upon information and belief, this fee on average exceeds $300.00.

41.    Upon information and belief, each Class member was insured under Garrison policies that were materially identical to Plaintiff Lemke's Garrison Policy with respect to Garrison's obligation to pay ACV in the event of a total loss.

**D.    *Garrison's Method for Determining Vehicle ACV***

42.    Garrison determines the ACV of total loss vehicles through the use of a software platform called "CCC One" and a "Market Valuation Report" that is derived from this platform. The platform was designed by a third-party, CCC Information Services, Inc. ("CCC").  A copy of Plaintiff's Market Valuation Report is attached as Exhibit B.

43.    The CCC One software and platform is designed for and marketed to insurance companies.

44.    Garrison contracts with CCC, and CCC allows Garrison to access and use the platform and Market Valuation Reports to adjust and settle total loss claims.

45.    As a uniform and standard business practice, Garrison uses the CCC platform to determine the ACV of every total loss vehicle.

46.    CCC's methodology is to take comparable vehicles—usually between 5 and 12—offered for sale in the general market area of the total-loss vehicle, i.e., vehicles of the same year, make, and model. CCC then adjusts sale price of each individual vehicle to account for differences between the comparable vehicle and the total-loss vehicle. For example, if the comparable vehicle has less mileage than the total-loss vehicle, CCC reduces the sale price of the comparable vehicle to account for the fact that vehicles with more mileage have less value. After these adjustments, the average of the comparable vehicles' adjusted prices is the "base value" of the total-loss vehicle.

47.    CCC has four "condition" levels: exceptional, retail (or dealer ready), private party average, and poor.

48.    CCC imposes an across-the-board, flat "condition adjustment" to take the vehicle from retail value to "private party" value. In other words, CCC assumes every comparable vehicle is in retail condition, and thus imposes the "condition adjustment" to take the comparable vehicles from retail to private party. This adjustment is typically hundreds of dollars, and sometimes can range up to or even exceeding $1,000.00.[2]

49.    As such, through the CCC One software—and as reflected in the Market Valuation Report— Garrison does not use the "retail value" of the total loss vehicle in determining the ACV.

---

[2] After the base value (with the condition adjustment applied to all comparable vehicles) is determined, CCC then makes adjustments based specifically on the condition of component parts of the total-loss vehicle itself, i.e., tires, interior, paint, etc. Said another way, the across-the-board "condition adjustment" is made to reduce the ***comparable*** vehicles to private party value to determine the base value, but then the condition of the ***total-loss*** vehicle is examined to arrive at the final adjusted vehicle value. So if the total-loss vehicle is in poor condition, a further reduction is imposed. Theoretically, however, all component parts of the total-loss vehicle might be in retail condition, meaning that the across-the-board "condition adjustment" would be wiped away. Plaintiff accounts for this possibility in the proposed Class definition by excluding those insureds who were paid retail value.

11

50.     As set forth above, Garrison gathers a select number of similar vehicles of the same make, model, and year as the insured vehicle. Garrison then applies an adjustment based on the mileage of the comparable vehicles compared to the mileage of the total loss vehicle. Garrison is, thus far, using the retail value to determine ACV, just as it is required to do.

51.     Defendant also applies an "options" adjustment, to account for differences in the optional equipment between the comparable vehicle and the total-loss vehicle. For example, if the total-loss vehicle has climate control but the comparable vehicle does not, Defendant, through CCC, would increase the price of the comparable vehicle to account for such difference (or vice versa). Thus far, Defendant is still using retail value to determine ACV, just as it is required to do.

52.     However, Garrison then applies the aforementioned "condition adjustment" to the retail prices of the comparable vehicle to reduce the value from retail to private party.

53.     By applying the "condition adjustment" deduction, Garrison is basing ACV on the private party value rather than retail value, in breach of its Policy and Illinois law.

54.     Worse yet, Defendant, through CCC, is misleadingly labeling the condition adjustment. CCC is used by dozens and dozens of insurers across virtually every single state. For the overwhelming majority of insurers and states, CCC labels on the Market Valuation Report precisely what it is doing: applying a condition adjustment to reduce the comparable vehicles to private party. For Defendant however, in Illinois, CCC's Market Valuation Reports simply change the lingo, and assert that the condition adjustment to a "common condition baseline." But it is the *exact same condition and in the exact same amount*. By changing the name from "private" to "common condition baseline"—in a state in which retail value is explicitly required—Defendant conceals from insureds that it is refusing to pay retail value, as Illinois law requires, and is instead

only paying private party value. This misleading tactic disguises the breach of the Policy and violation of Illinois law.

55.     Further, in identifying the base value amount, Defendant uses a certain number of comparable vehicles offered for sale, as mentioned above. However, the amount Defendant uses is the baseline vehicle purchase listed price—an amount that does not include the dealer preparation fees that will be added to the listed price when the vehicle is actually purchased. And Defendant does not then add a dealer preparation fee amount to that base amount.

56.     As such, Defendant is deducting or removing or not including dealer preparation fees in its payment, and is therefore not paying the ***actual*** cost to purchase a comparable vehicle in violation of its Policy. This also violates Illinois law, which proscribes deducting dealer prep fees from ACV payments.

**E.      *Garrison Failed to Pay Plaintiff the Actual Cash Value to Which She Was Entitled Because It Applied a Downward "Condition Adjustment" to All of the Comparable Vehicles Used to Determine Actual Cash Value.***

57.     Plaintiff owned a 2008 Pontiac G8, insured by Defendant.

58.     On or about November 2, 2015, Plaintiff was involved in an accident while operating the Insured Vehicle. Following the accident, Plaintiff filed a property damage claim with Defendant Garrison, claim number 019066431000000007001.

59.     Following the filing of Plaintiff's claim, Garrison determined it was uneconomical or impossible to repair Plaintiff's vehicle to its pre-loss condition, and thus determined the vehicle was a total loss. Thus, Garrison adjusted and settled the claim based on the Insured Vehicle's purported ACV.

60.     Defendant represented to Plaintiff that it was paying the vehicle's ACV.

13

61.     Garrison calculated the purported ACV of Plaintiff's vehicle by first determining the Insured Vehicle's "base value."  Specifically, Garrison determined that Plaintiff's Insured Vehicle had a base value of $11,475.00.  (Ex. B at 1.)

62.     To determine the base value, Garrison took the average retail price of ten comparable vehicles from car dealerships geographically similar to Plaintiff, all of which were the same make, model, and year as the Insured Vehicle.  (*Id.* at 10-13.)

63.     This amount was based solely on the listed-for-sale amount and did not include dealer prep fees.

64.     To each of the ten comparable vehicles, Garrison then imposed a condition adjustment of $1,114.00, thereby reducing the vehicle's value from retail to private party.  (*Id.* at 11 and 14.)

65.     The Market Valuation Report explains that the "condition adjustment" sets the comparable vehicles to "common condition baseline."

66.     By applying the "condition adjustment" to the comparable vehicles, Garrison reduced the average retail price of a comparable vehicle by $1,114.00.

67.     Garrison did not determine the Insured Vehicle's "base value" based on the average retail value of comparable vehicles, but rather, based on the lesser average private owner value of comparable vehicles.

68.     Garrison then found that some of the vehicle elements were in "Dealer Ready"[3] condition, and added back $200.00. As such, Garrison paid $914.00 less than retail value ($1,114.00 - $200.00).

_____

[3] Again, in virtually every state for virtually every insurer, the CCC Report accurately reflects that an upward adjustment for a specific vehicle part is applied when it is in "Dealer Ready" condition. Defendant instructs CCC to change the language to "Very Good" rather than "Dealer Ready" to disguise what is actually occurring.

69.    Plaintiff does not contest that the CCC report accurately reflects the average comparable vehicle retail value. Nor is it relevant to Plaintiff's allegations whether the CCC report accurately or inaccurately reflects the difference between average retail value and average private party value. Whatever the difference might be, the Policy and Illinois law require Garrison to pay the *retail* value.

70.    Garrison breached its contract with Plaintiff by failing to use retail value to replace the Insured Vehicle in determining the ACV cash payment.

71.    Garrison further breached its contract by deducting dealer prep fees from the actual cost to purchase a comparable vehicle.

## CLASS ACTION ALLEGATIONS

72.    Plaintiff brings this action individually and as a class action under Fed. R. Civ. P 23(a) and (b), on behalf of the following proposed Class:

> All persons: (a) who insured a vehicle for physical damage coverage under an Illinois automobile insurance policy issued by Garrison, (b) who made a claim under the policy comprehensive and/or collision coverage, (c) whose claim was determined to be a covered total loss, and (d) for whom Garrison applied a flat "condition adjustment" to the retail price of comparable vehicles and who did not recover the full "condition adjustment" amount through adjustments based on the condition of the total-loss vehicle, during the relevant statute of limitations time period.

73.    Excluded from the Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Judge(s) and Court staff assigned to this case and their immediate family members.  Plaintiff reserves the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

74.    **Numerosity:**  The members of the Class are so numerous that individual joinder of all Class members is impracticable.  While Plaintiff is informed and believe that there are

thousands of Class members, the precise number is unknown to Plaintiff, but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

75.    **Commonality and Predominance:**  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

      a.   whether Defendant is required to base its ACV settlement payments on retail value;

      b.   whether Defendant's application of a "condition adjustment" to comparable vehicles when determining an insured vehicle's ACV in the settlement reduces the amount from the "retail value" requirement;

      c.   whether the condition adjustment constitutes the equivalent of a "dealer prep" adjustment in violation of Illinois law and in breach of the Policy; and

      d.   the amount and nature of relief to be awarded to Plaintiff and the other Class members.

76.    **Typicality:** Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the other Class members were all similarly affected by Defendant's application of a "condition adjustment" to ACV total loss settlement payments under Illinois insurance policies that provided for an ACV payment in the event of total loss.  Plaintiff's claims are based upon the same legal theories as those of the other Class members.  Plaintiff and the other Class members sustained damages as a direct and proximate result of the same wrongful practices

in which Defendant engaged.  Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

77.    **Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other Class members, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds by failing to include sales tax and transfer fees in total loss situations, and Plaintiff intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected.

78.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, such that it would be impracticable for the Class members to individually seek redress for Defendant's wrongful conduct.  Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### COUNT 1
### BREACH OF CONTRACT FOR FAILURE TO PAY RETAIL VALUE

79.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1-78 as if fully set forth herein.

80.    Plaintiff brings this claim individually and on behalf of the other members of the Class.

81.    Plaintiff and each of the other Class members was parties to insurance contracts with Garrison, with terms set forth in the Garrison Policy.

82.    Plaintiff and each of the other Class members' insurance contracts are governed by Illinois law.

83.    Plaintiff and each of the other Class members made claims under their insurance contracts, which Garrison determined to be first-party total losses under the insurance contract, and additionally determined to be covered claims.

84.    Garrison invoked its ACV limit of liability clause and purported to pay Plaintiff and each of the other Class members the ACV of their total loss vehicles.

85.    Under the Policy as interpreted under Illinois law, Defendant's ACV payment was required to be based on the vehicle's retail value. Instead, through application of a conditioning adjustment, Defendant's ACV payment was based on private party value, not retail value.

86.    Defendant breached its contract with Plaintiff and each of the other Class members.

87.    As a result of the contractual breaches, Plaintiff and each of the other Class members have been damaged in that they received less than what was promised in their contracts, and they are entitled to actual damages in the amount of the condition adjustments divided by the

number of comparable vehicles, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

**COUNT 2**
**VIOLATION OF THE ILLINOIS CONSUMER**
**FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 *et seq.*)**

88.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1-78 as if fully set forth herein.

89.     Plaintiff brings this claim individually and on behalf of the other members of the Class.

90.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."  815 ILCS 505/2.

91.     In the course of trade or commerce, Garrison engaged in unfair and deceptive acts or practices by mislabeling its conditioning adjustment and changing the description from "private party" or "average private" to "common condition baseline". Moreover, Garrison unfairly and/or misleadingly changed the "Dealer Ready" description to "Very Good" condition.

92.     In so doing, Garrison hid that it was adjusting the vehicles to "private party" rather than using retail value, as required by Illinois law and its Policy.

93.     Garrison intended that Plaintiff and the other Class members rely on its deceptive and unfair conduct and on its misrepresentations regarding the value of the insured vehicles.

94.     As a result of Garrison's deceptive and unfair conduct, Plaintiff and each of the other Class members have been damaged in that they received less than what was promised in their contracts, and they are entitled to actual damages, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

## COUNT III
## BREACH OF CONTRACT FOR FAILURE TO PAY DEALER PREP FEES

95.     Paragraphs 1-78 and 80-84 are hereby incorporated by reference.

96.     Under the terms of the Policy as interpreted under Illinois law, Defendant was required to include in its payment an amount attributable to dealer prep fees, which are part of the actual cost to purchase a comparable vehicle and which cannot be excluded from that amount in insurance payments.

97.     Defendant breached its contract with Plaintiff and with all members of the putative Class because Defendant did not include an amount for dealer prep fees in purportedly making payment for the actual cost to purchase a comparable vehicle.

98.     As a result of such breach, Plaintiff and Class members sustained actual monetary damages in that they did not receive the benefit of their bargain, and are entitled to such monetary damages, i.e., the average dealer prep fee that is part of the actual cost to purchase a comparable vehicle and therefore should have been included in Defendant's payment of what was promised to be and should have been the actual cost to purchase a comparable vehicle. By not including an amount for dealer prep fees, Defendant did not actually pay the actual cost to purchase a comparable vehicle.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a.     An order certifying the proposed Class as requested herein, and appointing Plaintiff's undersigned attorneys as Counsel for the Class;

b.     An award of compensatory damages, and all other available damages, for Plaintiff and the other Class members against Garrison, as well as pre- and post- judgment interests on any amounts awarded;

c.     An order enjoining Garrison from continuing the illegal practices alleged herein, and for other injunctive relief as is proven appropriate in this matter;

d.     An award of attorney's fees, expenses, and costs of suit as appropriate pursuant to applicable law

e.     An order providing such other and further forms of relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  September 28, 2022                    Respectfully submitted,


**SHAMIS & GENTILE, P.A.**
*/s/ Andrew J. Shamis*
Andrew J. Shamis, Esq.
Illinois Bar No. 6337427
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299